**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **RON RUTLEDGE,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 20-2012-DDC-GEB** |
| **BOARD OF COUNTY COMMISSIONERS
OF JOHNSON COUNTY, KANSAS,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Ron Rutledge worked for defendant Board of County Commissioners of Johnson

County, Kansas in the Wastewater Department for 13 years.  But in 2018, defendant terminated

plaintiff's employment after plaintiff sat in the breakroom for an hour one morning and refused

to work.  Plaintiff argued he had permission to do so.  But defendant didn't believe him.  At the

same time, plaintiff filed a harassment complaint against his supervisor.  And, after investigating,

defendant concluded plaintiff's supervisor neither had harassed him nor retaliated against him.

This case is about those specific episodes and whether defendant discriminated or retaliated

against plaintiff when it terminated his employment, and thus violated the Americans with

Disabilities Act (ADA),[1] the Family and Medical Leave Act (FMLA), or Kansas common law.

To understand this case fully, both plaintiff and defendant ask the court to consider their

entire 13-year employment relationship.  Plaintiff highlights how, over the years, he sustained

---

[1]     Plaintiff seeks relief under the ADA.  *See* Doc. 61 at 2 (Pretrial Order ¶ 1.d.).  The court
construes the action as one under the ADA, as amended by the ADA Amendments Act of 2008
(ADAAA), and relies on that governing version of the ADA when ruling the pending motion.  *See Skerce
v. Torgeson Elec. Co.*, 852 F. App'x 357, 361–62 (10th Cir. 2021) (discussing *Adair v. City of Muskogee*,
823 F.3d 1297, 1304 (10th Cir. 2016)).

multiple workplace injuries, took extensive FMLA leave, and required multiple ADA accommodations.  In plaintiff's view, defendant resented him for his frequent injuries and resulting disability, and ultimately hatched a multi-year plot to terminate his employment. Defendant sees things differently.  For its part, defendant recounts several unsubstantiated complaints that plaintiff lodged against his fellow employees, who he often accused of bullying and harassment.  Defendant argues that this history mattered when it investigated plaintiff's contention that he had permission to sit in the break room for an hour in the morning without working.

The 13-year relationship the parties recount is lengthy and detailed.  Indeed, the parties' briefing on the current motion is just shy of 400 pages and submits 779 statements of purportedly undisputed facts, supported by 238 exhibits.  But in the end, this case is quite simple:  was defendant's decision to terminate plaintiff's employment because of the breakroom incident a pretext for discrimination or retaliation?   Defendant argues it was not, and so moves for summary judgment against plaintiff's claims (Doc. 64).  Because the undisputed material facts show that defendant is entitled to judgment as a matter of law, the court grants summary judgment for defendant.  The court explains this ruling, below.

## I.    Factual Background[2]

Plaintiff began working as a line and inspection crew member in the Johnson County Wastewater Department in 2005.  Doc. 61 at 2 (Pretrial Order ¶¶ 2.a.1–2).  In that job, he inspected manholes and cleaned sewer lines.  Doc. 65-1 at 10 (Pl.'s Dep. 30:19–31:2).  He eventually became a truck driver and worked in that position for the rest of his employment with defendant.  Doc. 61 at 3 (Pretrial Order ¶¶ 2.a.6–7).

---

[2]    The following facts either are stipulated in the Pretrial Order (Doc. 61), uncontroverted, or, where controverted, presented in the light most favorable to plaintiff.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

It's undisputed that plaintiff's mental proficiency is below average.  Indeed, defendant's corporate representative and one of plaintiff's supervisors knew that plaintiff had a limited education and read at a third-grade level.  *See* Doc. 72-37 at 4 (Hentschel 30(b)(6) Dep. 19:22–20:4); Doc. 72-33 at 12 (Cloud Dep. 53:20–22).

The parties provide a lengthy and detailed history of their 13-year employment relationship.  For the sake of brevity, the court provides a general overview for most of this 13-year period.  The court thus provides an overview of (1) the relevant cast of characters, (2) plaintiff's workplace injuries, and (3) his workplace harassment complaints.  The court discusses some specific facts from this period, where material to defendant's motion.  But for the most part, the court defers its statement of specific facts for the events directly surrounding the termination of plaintiff's employment.

### *Cast of Characters*

For clarity, the court first provides this list of the relevant individuals in this case and their roles in defendant's organizational structure:

- **Mr. Kenneth Kellison**, *Director of Operations and Maintenance for defendant's Wastewater Department*:  He made the decision to terminate plaintiff's employment. Doc. 65-29 at 1 (Kellison Decl. ¶ 2).

- **Ms. Jeanette Klamm**, *Assistant Director of Operations and Maintenance for defendant's Wastewater Department*:  She investigated the breakroom incident and participated in the decision to terminate plaintiff's employment.  Doc. 65-131 at 2 (Klamm Decl. ¶ 2).

- **Ms. Tiffany Hentschel**, *Deputy Director of Human Resources and defendant's Rule 30(b)(6) Corporate Representative*:  She investigated plaintiff's harassment complaint and participated in the decision to terminate plaintiff's employment.  Doc. 65-8 at 2 (Hentschel Decl. ¶ 2); *see generally* Doc. 72-1 (Hentschel 30(b)(6) Dep.).

- **Ms. Leslie Fortney**,[3] *Human Resources Partner*:  She investigated plaintiff's harassment complaints and participated in the decision to terminate plaintiff's employment.  Doc. 65-69 at 1 (Fortney Decl. ¶ 2).

- **Mr. Jeremy McCracken**, *Assistant Superintendent at the Blue River Treatment Plant, where plaintiff worked*:  He was plaintiff's direct supervisor in the months leading up to termination of plaintiff's employment.  Doc. 65-126 at 2 (McCracken Decl. ¶¶ 2–3); Doc. 72-1 at 21 (Hentschel 30(b)(6) Dep. 83:23–25).

- **Mr. George Cloud**, *Superintendent at the Blue River Treatment Plant from 2018 to 2020*:  He supervised McCracken in the months leading up to termination of plaintiff's employment.  Doc. 65-148 at 2 (Cloud Decl. ¶ 2); Doc. 72-1 at 21 (Hentschel 30(b)(6) Dep. 84:1–3).

### *Overview of Plaintiff's Workplace Injuries*

Throughout his employment, plaintiff reported 11 workplace injuries.  Doc. 61 at 2 (Pretrial Order ¶ 2.a.3.).  The first occurred in 2006.  *Id.* at 3 (Pretrial Order ¶ 2.a.4.).  That injury required three surgeries on plaintiff's neck and shoulder, resulting in several work restrictions and leaves of absence.  *Id.* (Pretrial Order ¶ 2.a.5.).  Importantly, that injury left plaintiff with a disability that defendant doesn't dispute for purposes of its motion.  *See* Doc. 65 at 89.  And, plaintiff filed a workers' compensation claim for that injury, which the court discusses in more detail below.  Doc. 65-8 at 5 (Hentschel Decl. ¶ 20).  For three years after this injury, defendant accommodated plaintiff's injury by changing some of his job requirements, adhering to certain lifting restrictions, and allowing leaves of absence.  Doc. 61 at 3 (Pretrial Order ¶ 2.a.5.).  But ultimately, because of plaintiff's inability to perform his job, defendant transferred plaintiff to a truck driver position in 2009.  *Id.* (Pretrial Order ¶ 2.a.6.).

Plaintiff sustained several other workplace injuries during his employment.  The details of those injuries aren't important for this Order, but the gist of them is this:  plaintiff's injuries often resulted in significant work restrictions, which defendant accommodated throughout the

---

[3]      In several places in the record, Ms. Fortney is identified by her birth name, Irwin.  *See* Doc. 65 at 34 n.9.

years.  *See* Doc. 61 at 3 (Pretrial Order ¶ 2.a.8.).  Defendant also provided plaintiff with several leaves of absence, and one of them extended for almost a year and a half.  *See id.* (Pretrial Order ¶ 2.a.9.).

Given plaintiff's extensive work restrictions, defendant discussed reassignment as a possible accommodation.  During an eight-month stretch in 2014 and 2015, Ms. Fortney—an HR partner—met with plaintiff to discuss possible reassignment.  *See* Doc. 65-69 at 2–3 (Fortney Decl. ¶¶ 5–11).  While the specifics of that accommodation process are disputed, the result is not:  after eight months of accommodation meetings between plaintiff and defendant, plaintiff returned to work as a truck driver.  *See* Doc. 65-8 at 7 (Hentschel Decl. ¶ 37); Doc. 65-1 at 66 (Pl.'s Dep. 254:3–24).  And, following the advice of plaintiff's doctor, defendant accommodated plaintiff's weight-lifting restrictions.  Doc. 65-1 at 66 (Pl.'s Dep. 254:3–24); Doc. 65-29 (Kellison Decl. ¶ 34); *see also* Doc. 65-96 (Medical Accommodation Request Form).

Of note, at the beginning of the accommodation process, Ms. Hentschel—defendant's Deputy HR Director—sent an email to Ms. Fortney and Mr. Kellison.  *See* Doc. 65-70 at 2.  Her email acknowledged that, during 2014, plaintiff and defendant still were working to settle plaintiff's workers' compensation claim from his 2006 injury.  Ms. Hentschel noted that these settlement negotiations would occur simultaneously with the accommodation process.  And so, should plaintiff require further medical treatment from the workers' compensation claim—and potentially "some kind of work restriction" as a result—then "that could put a kink in [defendant's] plans" to reassign defendant to a new position within 60 days.  *Id.*

The parties discuss several other relatively minor workplace injuries that led plaintiff to take medical leave for a few days at a time.  *See, e.g.*, Doc. 72 at 77–81.  But those injuries and any factual disputes that accompany them are immaterial to this Order.

### *Overview of Plaintiff's Workplace Complaints*

Throughout his employment, plaintiff also lodged several workplace complaints against his co-workers.  Defendant regularly investigated these complaints.  The specifics of the complaints and the investigations aren't material to this Order.  And, in any event, plaintiff objects to several of the details gleaned from the investigations as inadmissible hearsay.  But, for purposes of this Order, the court notes three things about these complaints and the investigations that followed them.  *First*, plaintiff often complained that others were singling him out or harassing him because of his workplace injuries.  *See, e.g.*, Docs. 65-44; 65-99.  *Second*, defendant investigated these complaints, but never found any merit to them.  *See* Docs. 65-23; 65-36; 65-45; 65-102.  And *third*, the memoranda of defendant's investigations, as well as plaintiff's mostly positive performance reviews, frequently refer to plaintiff telling his co-workers that he would report their actions to his attorney.  *See, e.g.*, Docs. 65-22; 65-23; 65-41; 65-45 at 4–5; 65-102 at 2–3.  While plaintiff denies that he ever did such a thing, *see* Doc. 65-1 at 33, 36 (Pl.'s Dep. 123:3–9, 134:16–23), he doesn't deny that defendant made a record about several of these threats.  *See, e.g.*, Doc. 72 at 20–21 (Uncontroverted Statement of Facts ¶¶ 52, 54).

Again, the details of each workplace complaint aren't material to this Order.  But the gist of them is this:  plaintiff often felt targeted and singled out for his workplace injuries; meanwhile, Mr. Kellison—then Assistant Director of Operations and, later, the person who decided to fire plaintiff—believed that plaintiff "had historically raised allegations against others that were not supported."  Doc. 65-29 at 11 (Kellison Decl. ¶ 60).

***Plaintiff's Interactions with Jeremy McCracken***

Before 2018, Mr. McCracken worked as an electrician at the Blue River Treatment Plant, where plaintiff also worked.  Doc. 65-126 at 2 (McCracken Decl. ¶ 3).  While the two interacted daily, Mr. McCracken didn't have any supervisory authority over plaintiff when they first began working together.  *Id.*  But, Mr. McCracken observed several workplace incidents where Mr. McCracken believed plaintiff had threatened co-workers with legal action.  *Id.* at 2–3 (McCracken Decl. ¶¶ 6–8).  So, Mr. McCracken encouraged his co-workers to report plaintiff to human resources for violating defendant's Positive Employee Relations Policy.  *Id.* at 3 (McCracken Decl. ¶ 9).

Eventually, Mr. McCracken himself reported plaintiff's behavior to human resources. Mr. McCracken's complaint focused on an episode where plaintiff had informed him and other employees at the plant that Mr. Kellison stopped by one afternoon and was upset that no employees other than plaintiff were there.  But Mr. Kellison had not visited the plant that day, and plaintiff later admitted he was just teasing his co-workers.  Doc. 65-126 at 3 (McCracken Decl. ¶ 11–12); Doc. 65-29 at 10 (Kellison Decl. ¶ 54); Doc. 65-127 at 2 (Fortney email documenting McCracken's complaint).  Mr. McCracken believed that plaintiff's actions "caused disruption and tension in the workplace."  Doc. 65-126 at 4 (McCracken Decl. ¶ 14).

In 2018, Mr. McCracken applied for an Assistant Superintendent position at the Blue River plant.  *Id.* (McCracken Decl. ¶ 16).  Plaintiff told the Superintendent at that time, Tim Engbroten, that he had overheard his co-workers saying that if Mr. McCracken got the position, he would bully plaintiff.  Doc. 65-128 (HR Emails); Doc. 65-1 at 70 (Pl.'s Dep. 270:14–24). Jeannette Klamm—Assistant Director of Operations at the Wastewater Department— investigated the incident.  Doc. 65-131 at 2 (Klamm Decl. ¶ 3–4).  When she spoke with

plaintiff, he wouldn't answer her questions.  Doc. 72-6 at 4 (Klamm Dep. 24:9–13).  And after interviewing a few other employees at the plant, Ms. Klamm concluded that though plaintiff "had alienated many of his coworkers," she "had no reason to believe Mr. McCracken had or would treat [plaintiff] inappropriately."  Doc. 65-131 at 2 (Klamm Decl. ¶¶ 3–4).  In his deposition, plaintiff testified that he couldn't remember where at work he heard the rumor about Mr. McCracken bullying him, nor could he remember who had said it.  Doc. 65-1 at 70 (Pl.'s Dep. 270:14–24).  But plaintiff did testify that Mr. McCracken and a few other employees called him "half-timer" because of his FMLA leave.  Plaintiff doesn't remember how many times Mr. McCracken called him "half-timer."  He didn't report those comments to anyone.  *Id.* at 35–36 (Pl.'s Dep. 131:7–133:8).

In May 2018, Mr. McCracken became the Assistant Superintendent at the Blue River Plant.  Doc. 65-8 at 8 (Hentschel Decl. ¶ 40).  At that time, he became plaintiff's direct supervisor.  Doc. 72-1 at 21 (Hentschel 30(b)(6) Dep. 83:23–25).

### *The Months Before Defendant Terminated Plaintiff's Employment*

In the summer of 2018, George Cloud became Superintendent at the Blue River plant.  Doc. 65-133 at 4 (Cloud Dep. 38:2–4).  Mr. Cloud primarily was stationed at another plant where he also served as Superintendent.  *See* Doc. 65-148 at 2 (Cloud Decl. ¶ 2).  But when he was at the Blue River plant, he usually interacted with plaintiff two times a week.  Doc. 65-133 at 5 (Cloud Dep. 51:5–52:1).  There are four other relevant episodes that occurred in the summer of 2018—just a few months before defendant terminated plaintiff's employment in December of that year.  The court briefly summarizes each one, below.

*First*, in May of 2018, plaintiff met with Mr. McCracken and told him he "had documented proof of people spying on him."  Doc. 65-132 at 2 (Incident Report).  He claimed

that people were going through his computer and his desk.  When Mr. McCracken asked if

plaintiff had any proof of his suspicions, plaintiff said he would provide proof "when the time

was right." *Id.*  Ms. Klamm investigated plaintiff's allegation and, ultimately, she found that no

one was spying on plaintiff or otherwise acting inappropriately.  Doc. 65-131 at 3 (Klamm Decl.

¶¶ 5–7).

*Second*, in June of 2018, plaintiff reported to Mr. McCracken that a chair in the room

where he was doing paperwork was broken and didn't have a back on it.  Doc. 65-1 at 70–71

(Pl.'s Dep. 271:2–273:4); Doc. 65-134 (Picture of the Chair); Doc. 65-125 at 9 (McCracken Dep.

67:23–68:2).  Sometime afterwards, plaintiff sat in the chair, it sprang him backwards, and

plaintiff sustained injuries to his neck, lower back, and shoulders.  Doc. 65-135.  As a result,

plaintiff's doctor issued several physical work restrictions for him.  Doc. 65-136.  And,

defendant approved plaintiff for FMLA leave shortly afterwards.  Doc. 72-20 at 14.  Plaintiff

sustained another workplace injury in July when a sewer hose spewed sludge on him.  Defendant

approved plaintiff for FMLA leave for that injury as well.  Doc. 72-1 at 25–26 (Hentschel

30(b)(6) Dep. 99:16–101:8).

*Third*, in September of the same year, Mr. McCracken sent Mr. Cloud a draft employee

assessment for plaintiff.  In that draft assessment, McCracken wrote that plaintiff was "job

proficient[,]" but noted several times that plaintiff performed deficiently when it came to team

work, leadership, and learning and development.  Doc. 65-144 at 5.

*Fourth*, sometime later in September, plaintiff told Mr. McCracken that the ladder he had

used for his truck checks (which conformed to his lifting restrictions and weight capacity) was

missing.  The summary judgment record is fuzzy about this episode, and the parties present

slightly different accounts of it.  According to plaintiff, the ladder was moved to a "utility truck

van" that Mr. McCracken used to drive.  Doc. 65-1 at 12 (Pl.'s Dep. 37:12–24).  But plaintiff didn't report that he had seen his ladder there because he believed "it would start a fight."  *Id.* (Pl.'s Dep. 37:25–38:4).  As he remembers it, plaintiff requested that Mr. McCracken replace his old ladder.  On the other hand, according to Mr. McCracken, plaintiff wanted to use an unapproved ladder that couldn't hold his weight.  Doc. 65-126 at 5 (McCracken Decl. ¶ 23).  So, Mr. McCracken emailed the plant safety manager, asking if plaintiff could use the unapproved ladder.  *See* Doc. 65-146.  The safety manager responded that plaintiff could use "only ladders that have the correct load capacity[,]" and instructed Mr. McCracken to "purchase a ladder [for plaintiff] that meets lifting restrictions as well as load capacity."  *Id.* at 2.  Mr. McCracken forwarded this email to plaintiff and instructed him not to use a ladder that didn't meet his weight requirements.  Doc. 65-147 at 2.  He told plaintiff he would "look into it and see if we can find a ladder that meets your weight requirements and lifting restrictions."  *Id.*  Eventually, Mr. McCracken and Mr. Cloud worked together to purchase a rolling ladder sufficient to bear plaintiff's weight and that didn't require any lifting.  *See* Doc. 65-126 at 5 (McCracken Decl. ¶ 27); Doc. 65-148 at 2–3 (Cloud Decl. ¶¶ 3–5).

There's also a dispute about a comment Mr. McCracken made to plaintiff during this episode.  Plaintiff testified that when he asked Mr. McCracken to replace the ladder, Mr. McCracken responded, "tough shit" and told plaintiff he would use whatever ladder Mr. McCracken could find for him.  Doc. 65-1 at 12 (Pl.'s Dep. 38:25–39:10).  Plaintiff maintains that Mr. McCracken's "tough shit" comment was about his lifting restrictions.  *Id.* at 80 (Pl.'s Dep. 311:19–312:4).  But defendant—relying on notes taken by Ms. Fortney when she interviewed plaintiff about this episode—contends that the "tough shit" comment was made in response to plaintiff and another employee's complaints that the rolling ladder defendant had

purchased was difficult to use.  *See* Doc. 65-154 at 3; *see also* Doc. 72-44 at 3 (Mr. McCracken noting (1) plaintiff's complaints about the rolling ladder's safety rails preventing him from getting under his truck's hood, and (2) Mr. McCracken's direction for plaintiff "to use the ladder to do what he could").  For the disputes about this comment and the request for a ladder, the court adopts plaintiff's version of events.  That is, construing all inferences in favor of plaintiff as non-movant, the court accepts that:  (1) plaintiff asked Mr. McCracken to replace his old ladder that conformed with his lifting restrictions; and (2) Mr. McCracken's "tough shit" comment was about plaintiff's lifting restrictions.

Somewhat related, plaintiff also testified about some general comments Mr. McCracken and Mr. Cloud made to him about his FMLA leave.  Plaintiff testified that, before he was fired, Mr. McCracken told him he couldn't take FMLA leave.  *See, e.g.*, Doc. 65-1 at 11 (Pl.'s Dep. 35:11–15) ("Q.  So tell me the conversation where [Mr. McCracken] said you couldn't get FMLA.  A.  I walked out, and I said, I told him, I said, 'I'm on FMLA.  I need new paperwork for the new year FMLA,' and he said, 'No, no FMLA.'").  Plaintiff also testified that, when he would return from FMLA leave, Mr. McCracken and Mr. Cloud both told him that they wanted him at work all the time.  *See id.* at 23 (Pl.'s Dep. 83:16–84:12) (testifying that Mr. McCracken said this "every time" plaintiff took FMLA leave, and Mr. Cloud said this "two or three times").

### The Breakroom Incident

On November 7 and 8, 2018, plaintiff took FMLA leave.  Doc. 65-126 at 5–6 (McCracken Decl. ¶¶ 28, 31).  Mr. McCracken emailed Ms. Fortney asking if plaintiff was approved for this leave.  *See* Doc. 65-149 at 2.  Ms. Fortney responded that plaintiff was approved for intermittent FMLA leave because of his injuries.  *Id.*  She also suggested that Mr. McCracken proactively send plaintiff new FMLA paperwork by year's end since plaintiff's

11

FMLA leave was "recurring[.]"  *Id.*  Mr. McCracken then scheduled two meetings with plaintiff to discuss whether he needed to renew his intermittent FMLA leave in the new year.  *Id.*

The day plaintiff returned from FMLA leave—November 9—he met with Mr. McCracken and Mr. Cloud for a performance review.  Doc. 72-33 at 11 (Cloud Dep. 50:23–51:5).  During that meeting, Mr. McCracken and Mr. Cloud told plaintiff that he had done well in his work performance, but that he needed to improve on his teamwork, leadership, and learning and development.  The two also told plaintiff that he would receive a 1% raise for the year, which was the lowest raise the County allowed.  Doc. 65-150 at 5 (McCracken Notes of Nov. 9 Meeting); Doc. 72-36 at 3 (Cloud Notes of Nov. 9 Meeting); Doc. 72-33 at 14 (Cloud Dep. 67:3–6, 67:19–20).  Only one other employee received a 1% raise that year.  *See* Doc. 65-125 at 13 (McCracken Dep. 147:7–16).  According to Mr. McCracken and Mr. Cloud, plaintiff was upset by this news.  He told them that he felt "targeted" and "singled out" because of the workplace injury he had sustained several years earlier.[4]  Doc. 65-150 at 5 (McCracken Notes of Nov. 9 Meeting); Doc. 72-36 at 3 (Cloud Notes of Nov. 9 Meeting).  Mr. Cloud then discussed the possibility of plaintiff transferring to another plant, given his interpersonal issues with other employees at the Blue River plant.  *See* Doc. 72-36 at 3 (Cloud Notes of Nov. 9 Meeting); *see also* Doc. 72-22 (Cloud Nov. 13 Email).

At some point during this meeting, plaintiff also told Mr. McCracken and Mr. Cloud that other employees sat in the breakroom for an hour every morning without working.  According to

---

[4]    Plaintiff testified that he didn't remember Mr. Cloud or Mr. McCracken discussing his performance review with him.  Nor did he remember saying he felt "targeted" or "singled out" because of his injuries.  *See* Doc. 65-1 at 13, 76 (Pl.'s Dep. 43:10–13; 44:18–25; 294:19–295:11).  But in "a response to a motion for summary judgment, a party cannot rest on ignorance of facts" to create a genuine dispute of material fact.  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  And, in any event, defendant's version of the facts here—that plaintiff reported feeling targeted and singled out because of his workplace injuries—favors plaintiff.

Mr. McCracken and Mr. Cloud, plaintiff told them he would start doing the same.  *See* Doc. 65-150 at 5 (McCracken Notes of Nov. 9 Meeting); Doc. 72-36 at 3 (Cloud Notes of Nov. 9 Meeting); Doc. 72-22 (Cloud Nov. 13 Email).  Sometime after he said that, Mr. McCracken left the meeting.  Then, Mr. Cloud and plaintiff continued to talk for 30–45 minutes.  Doc. 72-33 at 19 (Cloud Dep. 96:2–8).  That's when the record becomes mixed.  According to Mr. Cloud, he discouraged plaintiff from sitting in the breakroom for an hour without working.  And, at the end of the meeting, he believed that plaintiff had agreed not to do so.  *See* Doc. 72-36 at 3 (Cloud Notes of Nov. 9 Meeting); Doc. 72-22 (Cloud Nov. 13 Email).  But according to plaintiff, Mr. Cloud suggested "stay[ing] in the break room and mingl[ing]" with his co-workers "for about a half hour or so."  Doc. 65-1 at 13 (Pl.'s Dep. 43:16–22).  So, plaintiff planned to go into the breakroom the next workday and not work for an hour.  *Id.* at 76 (Pl.'s Dep. 295:12–16).  Plaintiff believed he had permission from Mr. Cloud to do this.  *Id.* (Pl.'s Dep. 296:4–7).  The court resolves this dispute in plaintiff's favor, as he is the non-movant.  Thus, the court adopts plaintiff's contention that he had permission from Mr. Cloud to sit in the breakroom without working for an hour.

The next workday was November 13.  That morning, plaintiff left a voicemail for Ms. Fortney saying that he believed Mr. McCracken was bullying him and retaliating against him because he had received a 1% raise.  *See* Docs. 65-152, 65-153.  Plaintiff then arrived at work at 7:00 a.m. and sat in the breakroom with several other employees.  Doc. 65-1 at 14 (Pl.'s Dep. 45:8–21, 46:11–13).  Later, Mr. McCracken came into the breakroom and asked plaintiff to start working.  Plaintiff said he wouldn't, and that he would stay in the breakroom until 8:00 a.m. because Mr. Cloud had given him permission to do so.  Mr. McCracken then called Mr. Cloud and asked if this was true.  Mr. Cloud said it wasn't.  Plaintiff himself then called Mr. Cloud,

who told plaintiff he had better get to work.  Plaintiff then told Mr. McCracken that he was going to see HR because he felt bullied and targeted.  *See* Doc. 65-1 at 14 (Pl.'s Dep. 46:14–47:19); Doc. 65-125 at 12 (McCracken Dep. 114:1–116:15); Doc. 65-150 at 5 (McCracken Notes); Doc. 72-36 at 3 (Cloud Notes).

After leaving, plaintiff visited the other plant where Mr. Cloud worked.  The two again discussed the possibility of plaintiff transferring to that plant.  *See* Doc. 65-1 at 78 (Pl.'s Dep. 301:22–302:5).  Mr. Cloud then emailed Ms. Klamm and Mr. McCracken with his notes about the day's events.  Specifically, he told them that plaintiff (1) had agreed to transfer to a different plant after the new year, and (2) also had "agreed to end his one hour strike in the mornings, which was triggered from his 'needs improvement' rating for his merit [salary] increase."  Doc. 72-22 at 2 (Cloud November 13 Email).

After his conversation with plaintiff, Mr. McCracken sent an email to Ms. Klamm (also copying Mr. Cloud), alerting her of plaintiff's harassment complaint against him.  He included several notes about his recent interactions with plaintiff.  Mr. McCracken emphasized the breakroom incident and plaintiff's contention that Mr. Cloud had told him he could sit in the breakroom for an hour without working.  Ms. Klamm forwarded that email to Ms. Fortney.  *See* Doc. 65-150.

Plaintiff's voicemail complaint and Mr. McCracken's email raised two issues:  (1) harassment and retaliation by Mr. McCracken, and (2) workplace misconduct by plaintiff, *i.e.*, the breakroom incident.  *See* Doc. 65-152; Doc. 72-1 at 27 (Hentschel 30(b)(6) Dep. 106:6–10).  As a result, defendant began two separate investigations.  Ms. Fortney investigated plaintiff's harassment and retaliation complaint against Mr. McCracken.  And Ms. Klamm investigated the breakroom incident.  Doc. 72-1 at 29 (Hentschel 30(b)(6) Dep. 113:20–114:12).

### *Ms. Fortney and Ms. Klamm's Investigations*

The court already has recounted the fruits of Ms. Fortney and Ms. Klamm's investigations. Specifically, pages 8 through 14 of this Order describe the events before, during, and after the breakroom incident. So, the court won't repeat those facts here—both because it's unnecessary and because plaintiff often has objected to the records of Ms. Fortney and Ms. Klamm's interviews with relevant witnesses as inadmissible hearsay.[5] So, in this section, the court merely recounts the steps Ms. Fortney and Ms. Klamm took during their investigations. But, where relevant and uncontroverted, the court recounts certain facts recorded by Ms. Fortney and Ms. Klamm in their notes.

Ms. Fortney began investigating plaintiff's complaint against Mr. McCracken the day after he reported it. She began by interviewing plaintiff. Doc. 65-69 at 4 (Fortney Decl. ¶ 23); Doc. 65-154 (Fortney notes of interview with plaintiff). In her notes from her interview with plaintiff, Ms. Fortney noted plaintiff's feeling that he felt "bullied about [his] raise this year[.]" Doc. 65-154 at 2. Ms. Fortney also noted Mr. McCracken's "tough shit" comment about the ladder, discussed above. *Id.* at 3. But, in a letter summarizing the meeting that Ms. Fortney later sent to plaintiff, she omitted the "tough shit" comment about the ladder. *See* Doc. 65-162.

Ms. Fortney next interviewed Mr. McCracken and Mr. Cloud separately. Doc. 65-69 at 5, 6 (Fortney Decl. ¶¶ 25, 33); Doc. 65-159 (Fortney notes of interview with McCracken); Doc. 65-160 (Fortney notes of interview with Cloud). She asked both of them about the breakroom incident and the issue with the ladder.

---

[5] The facts recited above about the breakroom incident were drawn from deposition testimony and declarations from the relevant individuals with personal knowledge. So, those facts aren't inadmissible hearsay.

In the end, Ms. Fortney found no evidence that Mr. McCracken had harassed, bullied, or retaliated against plaintiff.  Doc. 65-69 at 8 (Fortney Decl. ¶ 44).  She also concluded that she found "no reason to believe that Mr. McCracken treated [plaintiff] differently due to his work-related injuries or other protected activity."  *Id.*  Ms. Fortney shared her findings with Ms. Klamm and Mr. Kellison.  *Id.* (Fortney Decl. ¶ 45); Doc. 65-29 at 11 (Kellison Decl. ¶ 57).  But it's unclear exactly when Ms. Fortney finished investigating plaintiff's complaint against Mr. McCracken.  Defendant's corporate representative testified that Ms. Fortney concluded her investigation before defendant decided to fire plaintiff.  Doc. 72-1 at 29 (Hentschel 30(b)(6) Dep. 116:5–16).  But, it's undisputed that Ms. Fortney didn't memorialize her investigation in a formal report until December 27, 2018—after defendant had fired plaintiff.  *See* Doc. 65-166 (Fortney Memo).  This memo made the following findings:

- Plaintiff received a 1% merit increase that was lower than the year before because plaintiff didn't meet defendant's criteria for merit increases—specifically, he "was not interested in developing or using leadership skills or teamwork[;]"

- Plaintiff didn't provide any evidence that the 1% raise was retaliation for his workplace injury or his past complaints against Mr. McCracken, nor did he specify any examples of bullying or harassment by Mr. McCracken;

- Mr. McCracken's Outlook calendar logged several of plaintiff's medical appointments for work-related injuries, and other employees could see that information, unbeknownst to Mr. McCracken;

- Plaintiff was unhappy with the replacement ladder Mr. McCracken purchased for him because the safety rails "interfered with how [plaintiff] wanted to use the ladder for truck

inspections[;]" Mr. McCracken refused to modify the ladder; and the ladder "was sufficient, appropriate and safer than the ladder [plaintiff] was using previously[;]"

- Mr. McCracken was unaware of expectations for evenly distributing overtime to the truck drivers under his supervision, including plaintiff.

Doc. 65-166 at 1–2.

Ms. Fortney then recommended (1) working with all supervisory staff about proper privacy settings for Outlook calendars and (2) working with Mr. Cloud and Mr. McCracken to ensure equitable distribution of overtime. *Id.* at 3–4. Two more things are of note: (1) Ms. Fortney omitted Mr. McCracken's "tough shit" comment from her final memo; and (2) again, she finalized the memo on December 27, 2018, after defendant had terminated plaintiff's employment and after a board hearing where plaintiff appealed his termination.

Turning back the clock just a bit to Ms. Klamm's investigation, the summary judgment facts establish that Ms. Klamm began investigating the breakroom incident after Ms. Fortney internally concluded that plaintiff's harassment and retaliation complaint was meritless. *See* Doc. 65-131 at 3 (Klamm Decl. ¶ 10) (declaring that Ms. Klamm began her investigation on "November 26, 2018, after Ms. Fortney completed her investigation"). Ms. Klamm placed plaintiff on administrative leave during the investigation. *Id.* Ms. Klamm interviewed plaintiff, Mr. McCracken, and Mr. Cloud. The result of those interviews presents a now-familiar story. On one hand, plaintiff contended that several other employees sat in the breakroom after clocking in and that Mr. Cloud told him he could do the same. On the other hand, Mr. Cloud and Mr. McCracken contended that plaintiff should not do that and, instead, he should go to work. *Id.* at 3–5 (Klamm Decl. ¶¶ 10–23); *see also* Doc 65-169 (Klamm notes of meeting with plaintiff); Doc. 65-170 (Klamm notes of meeting with Cloud); Doc. 65-171 (Klamm notes of

meeting with McCracken).  Ms. Klamm also interviewed a witness of the breakroom incident,

Doug Nolkemper, who confirmed that plaintiff sat in the breakroom on the morning of

November 13 after 7:00 a.m.  Doc. 65-131 at 5–6 (Klamm Decl. ¶¶ 24–25).  According to Ms.

Klamm, Mr. Nolkemper believed that plaintiff "was sitting in the break room with a purpose[,]"

that he "seemed to be stirring up trouble[,]" and he "seemed to be picking a fight" with Mr.

McCracken.  *Id.* at 6 (Klamm Decl. ¶ 27).  Plaintiff denies that Mr. Nolkemper was in the

breakroom when he talked with Mr. McCracken.  Doc. 65-1 at 14 (Pl.'s Dep. 47:20–24).

Plaintiff testified that no one was in the breakroom during that exchange with Mr. McCracken.

*Id.* (Pl.'s Dep. 47:25–48:4).

At the end of her investigation, Ms. Klamm talked with Mr. Kellison to discuss next

steps.  Doc. 65-29 at 11 (Kellison Decl. ¶ 58).  According to Mr. Kellison, the two believed that

plaintiff's contention that "Mr. Cloud told him he could sit in the break room and do nothing for

the first hour was not credible on its face" and this contention "was contradicted by both Mr.

Cloud and Mr. McCracken[.]"  *Id.* (Kellison Decl. ¶ 59).  Mr. Kellison was "concerned about the

message it would send to the other employees and to the supervisors in the department if

[defendant] allowed [plaintiff] to refuse to work and to lie about the reasons he was not

working."  *Id.* (Kellison Decl. ¶ 61).  So, he emailed Ms. Fortney and Ms. Klamm and informed

them that the "plan right now is to proceed with termination."  Doc. 65-173 at 2.  Mr. Kellison

directed Ms. Klamm to draft a termination memo.  *Id.*

### *Defendant Terminates Plaintiff's Employment*

The next day, November 29, 2018, Ms. Klamm circulated her draft termination memo to

Mr. Kellison, Ms. Fortney, and Ms. Hentschel.  *See* Doc. 72-24.  The stated reason for

termination focused mainly on the breakroom incident:  defendant found plaintiff "was

insubordinate by refusing to work, even after his supervisor asked him to start working" and concluded that plaintiff "continue[d] to create an unnecessary distraction in the work environment with his insubordination and conduct inconsistent with [defendant's] values." *Id.* at 3–4. The memo vaguely discussed plaintiff using "unverifiable third parties to unnecessarily convince your supervisor to take or allow you to take specific actions, which upon questioning appear . . . unlikely to have occurred." *Id.* at 3. Also, it discussed generally "[m]ultiple examples of disrupting the work place . . . including taunting co-workers with favoritism or threats, arguing over electrical outlets, shutting off motion sensor lights, among many other irritants, which continue to cause disruption, tension, and stress between you and your co-workers." *Id.* at 4.

A few days later, Ms. Fortney suggested some edits and cuts to the draft termination memo, mostly about wording. *See* Doc. 72-25 (Fortney edits); Doc. 72-26 (Klamm incorporating those edits). But then, Ms. Hentschel suggested a more substantial edit. Ms. Hentschel suggested cutting the quoted language above about "[m]ultiple other examples of disrupting the workplace[.]" Doc. 72-27 at 4. Her comment reads:

> Your call but I suggest that you keep this simple and focus on his being untruthful and insubordinate. Every single thing we put in here will be subject to debate and the first is enough to support separation. And, if we are going to include it, we need to have given him an opportunity to speak to each issue – was the investigation that complete or is this based on the reports of others and not a conversation with him? I also suggest that you change words like insurdination [sic] to failed to follow supervisory direction and concsioulsy [sic] to intentionally, etc.

*Id.*

Ms. Klamm accepted Ms. Hentschel's suggestion. The final draft of the termination memo focused only on the breakroom incident. *See* Doc. 72-29. That draft was dated December 5, 2018. In relevant part, it read:

19

You verified that during a meeting on Friday, November 9, 2018, with Mr. Cloud and your direct supervisor, Jeremy McCracken, you threatened to start sitting in the breakroom for the first hour of your work days without working while you were being paid to work.  Both Mr. McCracken and Mr. Cloud told you that this behavior would be unacceptable and that doing so would be a problem.  You repeatedly threatened to engage in this behavior out of frustration because you perceived that other employees sit in the breakroom without working and Mr. Cloud repeatedly told you this would be unacceptable.  You also verified that on November 13, 2018, you arrived at the worksite at 6:20 am, ate breakfast, and talked with a co-worker.  You confirmed that you remained in the breakroom well after the start of your shift at 7:00 am and when Mr. McCracken told you to get to work, you refused to work until 8 am.  You stated that upon asking you to go to work, you told Mr. McCracken that Mr. Cloud told you it was okay for you to not do any work until 8 am.  Only after Mr. McCracken called Mr. Cloud and Mr. Cloud talked with you did you leave the breakroom and begin work.

*Id.* at 3.  The termination memo concluded that plaintiff had "engaged in conduct in violation of Johnson County Human Re[s]ources Policies by refusing to work, lying to your supervisor, and your continued insubordinate acts, all of which are unacceptable."  *Id.* at 4.

The next day, December 6, 2018, Mr. Kellison, Ms. Fortney, and Ms. Klamm met with plaintiff for a pre-disciplinary meeting.  Doc. 72-1 at 34 (Hentschel 30(b)(6) Dep. 146:11–25).  According to defendant, the purpose of this meeting was to present plaintiff with an "intent to terminate" and allow plaintiff the chance to explain the situation before Mr. Kellison made a final decision about terminating his employment.  *Id.* at 33 (Hentschel 30(b)(6) Dep. 142:13–143:14); *see also* Doc. 65-29 at 11 (Kellison Decl. ¶ 63).  After meeting with plaintiff, Mr. Kellison "decided to move forward with the termination since [plaintiff] took no accountability for his behavior" and made allegations "that were even more far-fetched than the one he had previously made."  Doc. 65-29 at 12 (Kellison Decl. ¶ 64).  The final termination notice, signed by Mr. Kellison, asserted that plaintiff, during the termination meeting, had "continued to state that Mr. Cloud approved your sitting in the breakroom and you did not take any ownership for your behavior."  Doc. 72-30 at 3.  Thus, defendant, through Mr. Kellison, announced its intent to terminate plaintiff's employment.  *Id.*

Plaintiff appealed this decision. *See* Doc. 65-176. He contended that defendant terminated his employment because he was told to "s[i]t in the break room by George Cloud who wanted me to talk to other people so they would not think I was being rude and ignoring them." *Id.* at 3. He also alleged that during the pre-disciplinary meeting, Ms. Fortney said she didn't agree with the termination decision. *Id.* Ms. Fortney denied making that statement. Doc. 65-69 at 9 (Fortney Decl. ¶ 47).

The appeal board affirmed the termination decision. On December 18, 2018, Defendant terminated plaintiff's employment. Doc. 72-1 at 6 (Hentschel 30(b)(6) Dep. 17:6–10).

## II.   Legal Standard

Summary judgment is appropriate when the moving party demonstrates "no genuine dispute" about "any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1173 (10th Cir. 2017). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it can "affect the outcome of the suit under the governing law[.]" *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]" *Celotex Corp.*, 477 U.S. at 323. A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's

case." *Id.* at 325.  If the moving party satisfies this initial burden, the non-moving party "must

set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250

(quotation cleaned up).  To satisfy this requirement, the nonmoving party must "go beyond the

pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324 (quotation cleaned up).  When deciding whether the parties have

shouldered their summary judgment burdens, the court's "function is not . . . to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut[.]" *Celotex Corp.*, 477 U.S.

at 327.  Instead, summary judgment is an important procedure "designed 'to secure the just,

speedy, and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1 (further

citation omitted)).

III.    **Analysis**

Plaintiff asserts four claims:  (1) ADA discrimination, (2) ADA retaliation, (3) FMLA

retaliation, and (4) retaliatory discharge under Kansas common law.[6]  The familiar *McDonnell*

*Douglas* burden-shifting framework for Title VII claims applies to all four claims.  *See Morgan*

*v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (applying framework to ADA disability

discrimination claim); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir.

2003) (applying framework to ADA and FMLA retaliation claims); *Hysten v. Burlington N.*

---

[6]      The court exercises supplemental jurisdiction over plaintiff's Kansas common law claim.  *See* 28
U.S.C. § 1367.  The court has original subject matter jurisdiction under 28 U.S.C. § 1331 because
plaintiff asserts ADA and FMLA claims against defendant, which are claims "arising under the . . . laws
. . . of the United States." 28 U.S.C. § 1331.  And, the court concludes, plaintiffs' Kansas common law
claim is "so related" to the ADA and FMLA claims that it forms "part of the same case or controversy
under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

*Santa Fe Ry. Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008) ("Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge claims." (citations omitted)).

Under that familiar framework, plaintiff first must present a prima facie case of discrimination or retaliation. Then, the burden of production shifts to the employer "to offer a legitimate nondiscriminatory [and nonretaliatory] reason for its employment decision." *Morgan*, 108 F.3d at 1323. If the employer offers such a reason, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact . . . whether the employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief." *Id.* (quotation cleaned up).

As plaintiff acknowledges, his four claims are interrelated because his original workplace injury caused his permanent disability and resulting ADA accommodations. And that injury, along with his subsequent workplace injuries, resulted in a "serious health condition," entitling him to frequent FMLA leave, more ADA accommodations, and workers' compensation claims protected by Kansas law. So, because all his claims essentially rely on the same theories and body of evidence, plaintiff argues the court must analyze his claims together. The court agrees, but only to an extent. The prima facie case for each claim differs a bit. So, the court analyzes each claim's prima facie case individually, below. But, because the court concludes (or, in one instance, assumes) that plaintiff has met his prima facie burden, the court streamlines the non-discriminatory/non-retaliatory reason and pretext analysis for all four claims. In other words, after analyzing the prima facie case for each legal theory individually, the court follows plaintiff's approach and applies the rest of its analysis to all four claims. *See, e.g.*, *Doebele*, 342 F.3d at 1135–39 (analyzing pretext stage for ADA and FMLA retaliation claims together).

A.      **Prima Facie Cases**

The court concludes (but in one instance, assumes) that plaintiff has met his light burden of establishing a prima facie case for each of his four claims.  The court briefly addresses each one, in turn.

1.  **ADA Discrimination**

Under the ADA, employers can't fire an employee "on the basis of disability[.]"  42 U.S.C. § 12112(a).  To establish a prima facie case for ADA discrimination, plaintiff must show: "(1) that he is disabled within the meaning of the ADA; (2) that he is qualified for the job held or desired; and (3) that he was discriminated against because of his disability."  *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (quotation cleaned up).  Defendant doesn't challenge the first two elements.  And plaintiff has shouldered his prima facie burden on the third element.[7]

Plaintiff advances several different means for satisfying the third element.  But the court need only consider one.  When viewed in the light most favorable to plaintiff, the summary judgment facts establish that in late September 2018, plaintiff asked Mr. McCracken to replace a ladder that was missing.  At that time, plaintiff was working under certain lifting restrictions because of his disability.  The missing ladder conformed to these lifting restrictions.  So, a

---

[7]      Plaintiff originally asserted ADA discrimination claims based on other actions occurring before defendant terminated his employment.  Defendant moved for summary judgment against those claims, and plaintiff has not responded to them.  Because plaintiff failed to address his non-termination-based ADA claims in his response, the court considers those claims abandoned.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (affirming district court's summary judgment dismissal of plaintiff's claim because plaintiff had "abandoned [the] claim by failing to address it in his response to defendants' motion for summary judgment"); *Loudon v. K.C. Rehab. Hosp., Inc.*, 339 F. Supp. 3d 1231, 1242 (D. Kan. 2018) (holding that plaintiff had abandoned claim by not responding to defendant's summary judgment arguments against the claim).

reasonable jury could find that plaintiff's request to replace the ladder sought a reasonable accommodation for his disability under the ADA.  Then, about six weeks after the request, plaintiff received his negative performance review and a 1% raise from Mr. McCracken and Mr. Cloud, which triggered the breakroom incident, and ultimately led defendant to terminate plaintiff's employment.  That cascading series of events suffices to establish a genuine issue whether defendant fired plaintiff because of his disability.  *See Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 749 (10th Cir. 1999) (concluding that temporal proximity between accommodation request and declining work evaluations that led defendants to eliminate plaintiff's job "contributes to an inference that Plaintiff's position was eliminated because of his disability").

Defendant disputes that plaintiff's request for a new ladder sufficed as a request for a reasonable accommodation under the ADA.  In defendant's view, plaintiff wanted to use a ladder that didn't support his weight.  Thus, defendant contends, plaintiff didn't request a new accommodation for his disability—he asked to use an unsafe ladder.  And so, defendant argues, nothing about the ladder episode raises an inference of disability discrimination.  To be sure, the summary judgment record is a bit fuzzy about plaintiff's request for a ladder.  But, construing all inferences in plaintiff's favor, a reasonable juror could conclude that plaintiff's ladder request generally sought to replace the missing ladder that complied with his lifting restrictions and held his weight.  After all, a request for a reasonable accommodation need not "invoke the magic words 'reasonable accommodation[.]'"  *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016).  Instead, it merely must alert the employer "that the employee wants assistance for his or her disability."  *Id.*  Plaintiff's request met this standard.  Indeed, the record presents a genuine issue whether defendant knew plaintiff had requested a replacement ladder that met his

weight and lifting restrictions.  At the end of the ladder episode, Mr. McCracken himself wrote

to plaintiff and advised that he would work to "find a ladder that me[t] [plaintiff's] weight

requirements and lifting restrictions."  Doc. 65-147 at 2.  Thus, the summary judgment facts

present a triable issue whether plaintiff requested a reasonable accommodation under the ADA.

And because defendant terminated plaintiff's employment six weeks after the request, there's a

triable issue whether plaintiff can satisfy his prima facie burden for his ADA discrimination

claim.  *See Butler*, 172 F.3d at 749 (concluding that temporal proximity between accommodation

request and declining work evaluations that led defendants to eliminate plaintiff's job

"contributes to an inference that Plaintiff's position was eliminated because of his disability").

## 2.  ADA Retaliation

The ADA prohibits employers from retaliating against employees who engage in an

activity protected by that act.  *See* 42 U.S.C. § 12203(a)–(b).  To make a prima facie case of

ADA retaliation, plaintiff must show that "(1) he engaged in a protected activity; (2) he was

subjected to an adverse employment action subsequent to or contemporaneous with the protected

activity; and (3) there was a causal connection between the protected activity and the adverse

employment action."  *Foster*, 830 F.3d at 1187 (quotation cleaned up).

Defendant concedes the second element.  And despite defendant's arguments, the court

concludes plaintiff has established a triable issue on the first and third elements of a prima facie

ADA retaliation claim, for the same reasons he established a genuine issue on a prima facie

ADA discrimination claim.  *First*, plaintiff engaged in activity protected by the ADA:  he

requested a reasonable accommodation, as discussed above.  *Id.* at 1188 (recognizing "that a

request for accommodation can constitute protected activity supporting a retaliation claim").

Defendant's arguments challenging this conclusion, also discussed above, are unpersuasive.

*Second*, plaintiff has established a triable issue whether a causal connection exists between the protected activity and the adverse employment action.  The events triggering his termination occurred about six weeks after his reasonable accommodation request.  And our Circuit has noted that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Id.* at 1191 (quotation cleaned up).

### 3.   FMLA Retaliation

Plaintiff's prima facie case for his FMLA retaliation claim is even more straightforward. Employers can't retaliate against employees for taking leave under the FMLA.  *See* 29 U.S.C. § 2615(a)(1)–(2).  So, an FMLA retaliation plaintiff must show:  "(1) [ ]he engaged in a protected activity; (2) [defendant] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007) (internal quotations omitted).  Here, defendant challenges the third element.  But the court isn't convinced.  Plaintiff has come forward with a triable issue about his prima facie FMLA retaliation claim.

*First*, plaintiff took FMLA leave on the two days before Mr. McCracken and Mr. Cloud gave him a negative performance review and a low raise.  *Second*, defendant terminated plaintiff's employment a few weeks later.  And *third*, the temporal proximity between plaintiff's last FMLA leave and the termination of his employment—about a month—suffices on its own to establish causation.  *See Foster*, 830 F.3d at 1191 (noting that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation" (quotation cleaned up)).  Thus, plaintiff has established a genuine issue whether a prima facie case of FMLA retaliation exists.  *See Campbell*, 478 F.3d at 1287–88 (explaining that a plaintiff states a

claim for retaliation where he "successfully took FMLA leave, was restored to [his] prior employment status, and was adversely affected by an employment action based on incidents post-dating [his] return to work").

### 4.   Retaliatory Discharge Under Kansas Common Law

Finally, Kansas law prohibits employers from firing employees because they have filed a workers' compensation claim or have sustained an injury allowing them to file such a claim. *See Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002). A plaintiff makes a prima facie showing of retaliatory discharge under Kansas law by showing: "(1) that he filed a claim for workers compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of the compensation claim or the fact that he sustained a work-related injury for which the plaintiff might file a future claim for benefits; (3) that the employer terminated the plaintiff's employment; and (4) that a causal connection existed between the protected activity or injury, and the termination." *Id.* Defendant challenges just the final requirement.

The court is skeptical that plaintiff has established a triable issue on his prima facie case for retaliatory discharge under Kansas law. Plaintiff's central theory for this claim is vague and, frankly, conspiratorial in content. He asserts that defendant hatched a plan to fire him as early as 2014. For support, he relies on an email Ms. Hentschel sent to Mr. Kellison and Ms. Fortney during that year, when the parties still were working to settle plaintiff's workers' compensation claim from his original 2006 workplace injury that required several surgeries. *See* Doc. 65-70. Plaintiff asserts that this email is a smoking gun documenting defendant's "plans" to terminate plaintiff's employment when it settled his workers' compensation claim. *See id.*

But plaintiff's argument simply is unfaithful to the summary judgment record on this point. Ms. Hentschel did not write, as plaintiff's papers assert, that plaintiff's request for court-ordered medical treatment "could put a 'kink' in the 'plans' to have Plaintiff resign." Doc. 72 at 142 (Pl.'s Statement of Facts ¶ 589) (citing Doc. 72-40 (Hentschel Email)). As a matter of actual fact, Ms. Hentschel wrote the following:

> I just participated in a conference call with our external work comp counsel with regard to [plaintiff]. Since we have received permanent restrictions, we are ready to move forward with an ADA placement process. We will work with him for 60 days to identify a suitable placement within the organization. If one cannot be found, we will evaluate options at that time. Since we will be simultaneously [sic] working to settle the work comp issues to include employment, I cannot tell you what will happen after the 60 days.
>
> One thing that could put a kink in our plans is that he has now requested treatment on his back. This has been court ordered so we have to provide. If that results in some kind of work restriction, we may have to delay the ADA process.

Doc. 72-40. Putting it bluntly, that email doesn't say what plaintiff says it does.

Even drawing every inference in plaintiff's favor, no reasonable juror could find that Ms. Hentschel's email is a smoking gun where defendant admitted that plaintiff's workers' compensation claim would put a kink in its plans to fire plaintiff. In an extended back and forth with plaintiff's counsel at her deposition, Ms. Hentschel explained what her email meant:

> Q. How could [plaintiff's requested treatment] put a kink in your plans?
>
> A. Because the 60 days, if he has different restrictions coming out of that, we were starting the ADA placement process based on what we knew at the time. If additional information came up with regard to restrictions, then we would have had to take those into account as well.

Doc. 72-37 at 10 (Henstchel Dep. 134:6–15).

With that dissonance resolved in favor of what the summary judgment record actually says, plaintiff's workers' compensation claim skates on incredibly thin ice. Based on the evidence plaintiff has provided, no reasonable juror could believe his theory that defendant

hatched a multi-year plan in 2014 to terminate his employment four years later in retaliation for his workers' compensation claim.[8]

Plaintiff's alternative theory—that defendant retaliated against him because of a different workplace injury where plaintiff was thrown backwards from a chair—fares only slightly better. It's more specific, but it suffers from a significant causation flaw. That injury, which plaintiff sustained in June 2018, occurred six months before defendant terminated plaintiff's employment in December 2018. And, under our Circuit's precedent, a more than three-month period between a workplace injury and an adverse employment action can't suffice on its own to establish a causal connection between the two. *Foster*, 830 F.3d at 1191 (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

Plaintiff identifies just one other meaningful fact in his attempt to meet his prima facie burden. He cites Mr. McCracken's deposition, where Mr. McCracken testified that, before he became plaintiff's supervisor, he believed plaintiff created discord in the workplace by talking about "his lawyers and how he had used them against the county and that he would use them against other people[.]" Doc. 72-4 at 4 (McCracken Dep. 33:24–34:1). Plaintiff also highlights comments from Mr. Kellison, who testified that he felt threatened by plaintiff's comments in

---

[8]       Plaintiff also raises the settlement negotiations of plaintiff's workers' compensation claim as support for his multi-year plot theory. In her deposition, Ms. Hentschel acknowledged that separation of plaintiff's employment was on the table during settlement negotiations for plaintiff's workers' compensation claim. Doc. 72-37 at 9–10 (Henstchel Dep. 132:21–133:4). Defendant argues that fact would be inadmissible at trial. *See* Fed. R. Evid. 408 (providing that evidence of an offer during settlement negotiations or "conduct or a statement made during compromise negotiations about the claim" is inadmissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or contradiction"). But Rule 408 allows the court to admit statements or offers made during negotiations settlements to show "a witness's bias or prejudice[.]" Fed. R. Evid. 408(b). Though plaintiff didn't make this argument, his multi-year plot theory arguably falls within Rule 408's exception. But the court need not resolve this issue because no reasonable juror could believe plaintiff's theory based on the actual content of the summary judgment record. And, as explained more below, the court assumes plaintiff has established a triable issue whether a prima facie retaliatory discharge claim exists. So, the court's choice not to resolve this issue is immaterial.

2015 that plaintiff was "going to put [Mr. Kellison] under oath" at a workers' compensation

hearing.  Doc. 72-43 at 11 (Kellison Dep. 117:18–118:17).  The court is skeptical that any

reasonable juror could find either testimony to establish an inference of retaliation for plaintiff's

workers' compensation retaliation claim.  But, drawing all inferences in plaintiff's favor, the

court grants plaintiff the benefit of the doubt.  So, the court assumes that plaintiff has established

a triable issue about his prima facie claim for retaliatory discharge.  It is a generous assumption.

### B.    Legitimate, Non-Retaliatory/Non-Discriminatory Reason

With the conclusion (or assumption) that plaintiff could establish his prima facie cases,

the burden shifts to defendant.  It must articulate a legitimate, non-retaliatory, non-discriminatory

reason for terminating plaintiff's employment.  At this second step of the *McDonnell Douglas*

framework, defendant doesn't "'need to litigate the merits of the reasoning, nor does it need to

prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was

applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966

F.3d 1038, 1058 (10th Cir. 2020) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir.

1992)).  "This stage of the analysis only requires the defendant to articulate a reason for the

[termination] that is not, on its face, prohibited and that is reasonably specific and clear."  *Id.*

(quotation cleaned up).

Defendant easily carries that burden here.  Defendant terminated plaintiff's employment

because of the breakroom incident where plaintiff claimed he had permission to sit in the

breakroom after clocking in and not work for an hour.  In its termination notice given to plaintiff,

defendant articulated that plaintiff was "insubordinate through [his] refusal to work" and was

"dishonest to [his] supervisor[,]" which defendant deemed "unacceptable." Doc. 72-30 at 3. That stated reason suffices at this second step of the analysis.[9] So, the court moves on to pretext.

### C.     Pretext

The burden shifts again to plaintiff, who must present a genuine issue of material fact whether defendant's asserted reason for terminating his employment was pretextual. To meet this burden, plaintiff must provide evidence that "the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable factfinder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination" or retaliation. *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). To analyze whether a reasonable juror could find pretext under this standard, the court doesn't ask "whether the employer's reasons were wise, fair or correct[.]" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007). Instead, the court asks "whether the employer honestly believed its reasons and acted in good faith upon them." *Id.* at 1119.

The court thus considers "the facts as they appeared to the person making the decision," and doesn't "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Id.* "The reason for this rule is plain: [the court's] role is to prevent intentional discriminatory [employment] practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young*, 468 F.3d at 1250; *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912,

---

[9]     Plaintiff objects to defendant recounting the parties' multi-year employment relationship in its motion as context for its decision to terminate plaintiff's employment. But plaintiff's argument more appropriately goes to pretext. From the moment it terminated plaintiff's employment, defendant always has asserted the breakroom incident as the reason for its decision. That stated reason meets defendant's relatively light burden at this stage. *See Frappied*, 966 F.3d at 1058 ("This stage of the analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited and that is reasonably specific and clear." (quotation cleaned up)).

925 (10th Cir. 2004) ("'An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.'" (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998))).

Plaintiff asserts five arguments to establish pretext. The court considers each one, below. Analyzing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, the court concludes that his pretext arguments—either individually or taken as a group— fail to create a genuine, triable dispute of material fact about pretext. The court addresses each argument, below.

### 1. Changing Reasons for Termination

To begin, plaintiff argues that defendant changed the reasons for terminating his employment before it settled on the proffered reason, *i.e.*, the breakroom incident. As support, plaintiff highlights the termination notice's drafting process between Ms. Klamm, Ms. Fortney, and Ms. Hentschel. But it's undisputed that the termination notice always revolved around the breakroom incident. *Compare* Doc. 72-24 (First Draft of Termination Notice), *with* Doc. 72-30 (Final Termination Notice). At the beginning of the drafting process, Ms. Klamm listed several other general and vague reasons justifying plaintiff's firing. The draft memo vaguely referenced plaintiff using "unverifiable third parties to unnecessarily convince [his] supervisor to take or allow [him] to take specific actions, which upon questioning appear . . . unlikely to have occurred." Doc. 72-24 at 3. The draft memo also discussed generally "[m]ultiple examples of [plaintiff] disrupting the work place . . . including taunting co-workers with favoritism or threats, arguing over electrical outlets, shutting off motion sensor lights, among many other irritants, which continue to cause disruption, tension, and stress between you and your co-workers." *Id.* at 4. Ms. Hentschel suggested cutting these reasons from the termination notice. In a comment

on the draft, Ms. Hentschel suggested keeping the termination notice "simple and focus[ing] on [plaintiff] being untruthful and insubordinate."  Doc. 72-27 at 4.  In her words, every "single thing we put in here will be subject to debate and the first [the breakroom incident] is enough to support separation."  *Id.*  Ms. Klamm followed Ms. Hentschel's suggestion and focused the final draft of the termination notice on the breakroom incident.

Invoking our Circuit's decision in *Fassbender v. Correct Care Solutions, LLC*, plaintiff argues that a reasonable juror could infer from this drafting process that defendant "abandoned its original explanations in favor of one that's harder to assail because it knew that none of the explanations were true."  890 F.3d 875, 888 (10th Cir. 2018).  While plaintiff's right that shifting explanations for termination can suggest pretext, plaintiff's quoted language from *Fassbender* doesn't apply here.  Defendant never "abandoned" its central reason for terminating plaintiff's employment, like the *Fassbender* defendant did.  In that case, when defendant fired plaintiff, it offered several reasons for doing so.  Then, when responding to plaintiff's EEOC charges, defendant changed its reasons for firing plaintiff.  And yet again, on summary judgment, defendant abandoned all those reasons and retreated to the alternative reason it originally had offered.  *See Fassbender*, 890 F.3d at 887.  The Circuit concluded it was "significant that (1) [defendant] failed to consistently identify which of these acts it terminated [plaintiff] for; and (2) [defendant] eventually abandoned all of these various violations . . . in favor of only a single violation."  *Id.* at 888.  But here, defendant never has abandoned the central reason for terminating plaintiff's employment—not during the drafting process, and not since.

Also, and accepting that defendant did abandon some other reasons for terminating plaintiff's employment during the drafting of the termination notice, that decision came *before* defendant fired plaintiff.  And that's significant.  Our Circuit repeatedly has emphasized that a

changed reason for termination "support[s] the inference of pretext when it occurs *after* significant legal proceedings have occurred." *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005) (emphasis added) (emphasizing "the timing of the change in position" as a significant factor when evaluating whether changed reasons suggest pretext); *see also Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) ("*Post-hoc* justifications for termination constitute evidence of pretext." (emphasis added)); *Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 773 (10th Cir. 2008) ("We have indicated that a *post-hoc* justification given at the time of trial, which differs from the reasons given at the time of termination and is unsupported by the evidence, could lead a reasonable jury to infer that the reason asserted at trial is pretextual." (emphasis added)).

This explicit focus on the timing of the changed reasons makes perfectly good sense. After all, our Circuit recently stressed that "pretext cannot be established by the mere fact that the employer has offered different explanations for its decision." *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1291 (10th Cir. 2022) (quotation cleaned up). "Rather, inconsistency evidence is only helpful to a plaintiff if the employer has changed its explanation under circumstances that suggest dishonesty or bad faith." *Id.* (quotation cleaned up); *see also Mueggenborg v. Nortek Air Sols., LLC*, No. 20-6147, 2021 WL 4807176, at *8 (10th Cir. Oct. 15, 2021) (assuming employer provided an "inconsistent explanation" for firing plaintiff but concluding that the circumstances still did "not suggest [the employer] changed its explanation under circumstances that suggest dishonesty or bad faith" because plaintiff's firing was still justified even without the "inconsistent explanation"). Here, defendant's decision to jettison additional reasons for termination *before* defendant terminated plaintiff's employment—while

consistently sticking with the central reason that prompted the firing decision in the first place—doesn't suggest dishonesty or bad faith. No reasonable juror could conclude otherwise.

This isn't to say that evidence gleaned from an employer's decision-making process before it terminated a plaintiff's employment *never* can serve as evidence of pretext. But it can't here. Contrary to plaintiff's arguments, the summary judgment facts establish that this isn't a case where defendant decided to terminate plaintiff's employment and then cycled through several reasons before settling on the one that's "harder to assail[.]" *Fassbender*, 890 F.3d at 888. To the contrary, from the first draft of the termination notice to the summary judgment motion currently before the court, defendant's central reason for firing plaintiff has remained the same.

The court recognizes that some examples defendant referenced in its first draft of the termination notice found their way into the lengthy factual history of defendant's motion for summary judgment. But that choice by defendant doesn't suggest pretext. Defendant explains that it included this lengthy history of plaintiff's entire employment to (1) contextualize the parties' employment relationship to understand fully the decisionmakers' point of view in November 2018; and (2) "illustrate that Plaintiff's behavior warranted termination numerous times before [defendant] terminated his employment." Doc. 77 at 1. Rejecting an argument like plaintiff's here, our Circuit has approved of the choice defendant made here. *Litzsinger*, 25 F.4th at 1292 (rejecting plaintiff's pretext argument based on defendant offering several additional reasons for termination in its motion for summary judgment because "[r]eading the motion as a whole . . . [t]he motion does not say that [plaintiff] was terminated for the additional reasons, only that [plaintiff] could have been justifiably terminated for any number of reasons"). So, the

court concludes that no reasonable juror could find or infer pretext from defendant's choice to include this history in its motion for summary judgment.

### 2. Reason for Termination—Whether Plaintiff Had Permission to Sit in the Breakroom

Plaintiff next focuses on the central reason defendant provided for terminating his employment—that he sat in the breakroom for an hour without working.  In his view, that reason is disputed.  Plaintiff maintained then, and maintains now, that Mr. Cloud gave him permission to sit in the breakroom for an hour without working.  *See, e.g.*, Doc. 65-1 at 11 (Pl.'s Dep. 34:16–18).  So, from his vantage point, he didn't do anything wrong, and defendant shouldn't have fired him.

Defendant understood plaintiff's position when it decided to fire him.  But, after investigating the breakroom incident and interviewing all relevant parties, defendant (through Mr. Kellison) determined that plaintiff's contention that "Mr. Cloud told him he could sit in the break room and do nothing for the first hour was not credible on its face" and "was contradicted by both Mr. Cloud and Mr. McCracken[.]"  Doc. 65-29 at 11 (Kellison Decl. ¶ 59).  So, believing that plaintiff did not have, in fact, permission from Mr. Cloud to sit in the breakroom for an hour without working, defendant terminated plaintiff's employment because of insubordination.

Plaintiff makes much of defendant's concession that there's a dispute about "the ultimate incident that led to [plaintiff's] termination" *i.e.*, whether plaintiff had permission from Mr. Cloud.  Doc. 72-1 at 33 (Hentschel 30(b)(6) Dep. 141:19–142:7).  But this concession doesn't automatically guarantee plaintiff a trial.  Even accepting a genuine dispute whether plaintiff had permission to sit in the breakroom, that dispute isn't a material one for the ultimate issue of pretext.  The relevant inquiry is whether the decisionmakers believed in good faith that plaintiff

was insubordinate by sitting in the breakroom without working.  *See Riggs*, 497 F.3d at 1119; *Young*, 468 F.3d at 1250.  So, even if plaintiff actually had received permission to sit in the breakroom, defendant—after investigating plaintiff's contention—believed he didn't have such permission.  And, under well-established principles for showing pretext, that's the belief that matters.  *Rivera*, 365 F.3d at 925 ("Perhaps a reasonable factfinder could observe all the witnesses and believe Plaintiff's version of the events . . . . [But], that is not the issue."); *see also Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007) (explaining that, when analyzing pretext, "it is not what [a decisionmaker] *should* have known that matters, but whether he acted in good faith upon the beliefs he held"); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (rejecting plaintiff's pretext argument about a "false justification for termination" because even assuming that plaintiff didn't engage in misconduct, as he contended, "a challenge of pretext requires [the court] to look at the facts as they appear to the person making the decision to terminate plaintiff" and plaintiff failed to create genuine dispute about defendant's *belief* plaintiff had engaged in misconduct).  In the end, the mere fact that defendant didn't believe plaintiff's side of the story isn't evidence of pretext.  *See Est. of Bassatt v. Sch. Dist. No. 1 in the City & Cnty. of Denver*, 775 F.3d 1233, 1240 (10th Cir. 2014) (explaining that an employer's "decision to believe [one employee] over [another], when there was no direct evidence either way, is not evidence of pretext").

Resisting this conclusion, plaintiff shifts gears.  He contends that his termination was objectively unreasonable because, after some back and forth with Mr. McCracken, plaintiff eventually left to go to work when Mr. Cloud told him to.  And, plaintiff asserts, Mr. Cloud's description of the breakroom incident as a "strike" in his deposition testimony and his notes of the incident "makes it more likely that [Mr.] Cloud gave Plaintiff permission" to sit in the

breakroom.  Doc. 72 at 187.  Bringing it all together, plaintiff then asserts that defendant disregarded plaintiff's objectively reasonable (or at worst, mistaken) belief that he had permission to sit in the breakroom because defendant saw "an opportunity to finally accomplish the 'plans'—first discussed 4 years earlier—to get rid of Plaintiff."  *Id.* at 188.

This argument proves far too much.  And, yet again, it focuses on the wrong inquiry.  The relevant inquiry isn't whether plaintiff had permission to sit in the breakroom without working. The relevant inquiry is whether defendant believed in good faith that he didn't have permission, and thus was insubordinate.  *Est. of Bassatt*, 775 F.3d at 1241.  The record reflects defendant held that belief in good faith.  To undermine that belief, plaintiff would need to adduce some evidence enabling a reasonable juror to conclude that defendant's belief "was so implausible, incoherent, or internally contradictory that [defendant] must have made [its] decision on some other basis."  *Rivera*, 365 F.3d at 925.  The summary judgment facts here establish plaintiff has failed to shoulder that burden.  Instead, he's merely re-offered his side of the story.  This pretext argument fails.

### 3.  Unfair Investigations

Somewhat related to the discussion above, plaintiff contends Ms. Fortney and Ms. Klamm conducted unfair investigations of his harassment complaint and the breakroom incident, respectively.  "A factfinder can reasonably infer pretext . . . from shortcomings in the employer's investigation" of the misconduct leading to termination.  *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1199 (10th Cir. 2021).  "For example, a factfinder can reasonably infer pretext from an employer's failure to inquire into the reasons for an employee's behavior."  *Id.* at 1199–1200.  It thus follows that "an employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version

of events.'" *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006)).

This principle easily disposes of plaintiff's challenge to Ms. Klamm's investigation of the breakroom incident.  Ms. Klamm interviewed plaintiff.  She got his side of the story.  Under our Circuit's precedent, that fact alone defeats an inference of pretext based on an allegedly flawed investigation.  *See Dewitt*, 845 F.3d at 1314 (concluding that plaintiff's "unfair-investigation argument is overcome by the simple fact that [the employer] asked [plaintiff] for her version of events"); *Est. of Bassatt*, 775 F.3d at 1240 (rejecting plaintiff's unfair investigation pretext argument because employer heard plaintiff's response to a misconduct allegation and believed the accusing employee's accusation); *cf. Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014) (finding evidence of pretext where decisionmakers relied on "one-sided information" and accepted allegations of misconduct against plaintiff without getting his side of the story, but noting that if decisionmakers "had allowed [plaintiff] to respond" to the allegations before firing him, the court "could perhaps accept" that decisionmakers found the accuser's "version of events more credible").

Plaintiff's challenge to Ms. Fortney's investigation of his harassment complaint against Mr. McCracken requires a bit more.  Plaintiff lobs two main objections at Ms. Fortney's investigation.  Primarily, he objects that Ms. Fortney omitted Mr. McCracken's "tough shit" comment about the replacement ladder from her final memorandum about the investigation, even though she recorded that comment in her notes of her interview with plaintiff.  *Compare* Doc. 65-154 at 3 (Fortney notes), *with* Doc. 65-166 (Fortney Memo).  Remember, there's a dispute about what that "tough shit" comment referenced.  Plaintiff maintains the comment was directed at his lifting restrictions.  Doc. 65-1 at 80 (Pl.'s Dep. 311:19–312:4).  But defendant contends the

comment responded to complaints by plaintiff and another employee that the rolling ladder defendant had purchased was difficult to use.  *See* Doc. 65-154 at 3 (Fortney notes).  Ultimately, though, this dispute doesn't matter.  Even accepting plaintiff's version of events as the summary judgment fact, this comment falls in the bucket of what our Circuit has called a "stray remark." *Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir. 1995).  A "stray remark by someone not in a decision-making position does not establish intent to discriminate."  *Id.*; *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions.").  As explained in more detail below, Mr. McCracken was not involved in the termination decision.  To be sure, his report of the breakroom incident triggered the investigation resulting in termination.  And Mr. McCracken provided his account of the breakroom incident during that investigation.  But to make his actions relevant to the termination decision, "plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process."  *BCI Coca-Cola*, 450 F.3d 487.  Instead, plaintiff must establish that the "biased subordinate's discriminatory reports, recommendation, or other actions caused" the termination.  *Id.*; *see also id.* at 488 (qualifying that "an employer can avoid liability by conducting an independent investigation of the [biased subordinate's] allegations against an employee").  So, because Mr. McCracken's "tough shit" comment was unrelated to the termination decision and thus—on its own—can't establish pretext, Ms. Fortney's failure to include the "tough shit" comment in her final report doesn't suggest pretext.

Plaintiff also cries foul at Ms. Fortney's investigation because she reached two conclusions that are favorable to plaintiff:  (1) that Mr. McCracken's calendar was publicly available and so other employees could see plaintiff's medical appointments, and (2) Mr.

McCracken hadn't established an equitable process for distributing overtime amongst employees. *See* Doc. 65-166 at 2–3. Notably, Ms. Fortney didn't memorialize these findings until after defendant had terminated plaintiff's employment. So, plaintiff contends, Ms. Fortney's belated findings suggest pretext. Plaintiff contends that Ms. Fortney withheld her findings so that defendant could fire plaintiff. But these belated findings were ancillary to plaintiff's harassment complaint. They don't suggest that Mr. McCracken targeted, harassed, or bullied plaintiff because of his workplace injury, as plaintiff has alleged. And most importantly, Ms. Fortney's findings don't create a genuine issue whether defendant's stated reason for terminating plaintiff's employment was "too weak, implausible, inconsistent, incoherent, or contradictory to believe as the legitimate reason for termination." *Litzsinger*, 25 F.4th at 1293 (quotation cleaned up). In fact, her findings say nothing at all about defendant's reason for terminating plaintiff's employment. No reasonable juror could conclude that Ms. Fortney withheld these favorable findings to justify plaintiff's firing, so this pretext argument fails as well.

### 4. Disparaging Comments

Plaintiff next invokes a few disparaging comments made by Mr. McCracken, Mr. Cloud, and Mr. Kellison during plaintiff's employment. They are:

- Mr. McCracken's "tough shit" comment about the ladder;

- Mr. McCracken and Mr. Cloud's negative comments about plaintiff's FMLA leave; and

- Mr. Kellison's comments from several years earlier about plaintiff's transfer to a truck driver position, and about plaintiff's workers' compensation claim.

The court finds plaintiff's disparaging comments theory unpersuasive for three reasons.

*First*, the court already has addressed why Mr. McCracken's "tough shit" comment doesn't suggest pretext.  The court need only reiterate that Mr. McCracken was not involved in the decision to terminate plaintiff's employment.  And, plaintiff hasn't tied this comment to defendant's termination decision in a way that suggests pretext.

*Second*, Mr. McCracken and Mr. Cloud's negative FMLA comments are unavailing for much the same reason.  Plaintiff testified that Mr. McCracken used to call him "half-timer" before he became plaintiff's supervisor.  Doc. 65-1 at 35–36 (Pl.'s Dep. 131:7–133:8).  Plaintiff also testified that Mr. McCracken told him he couldn't take FMLA leave sometime before he was fired.  *See, e.g.*, *id.* at 11 (Pl.'s Dep. 35:11–15) ("Q.  So tell me the conversation where [Mr. McCracken] said you couldn't get FMLA.  A.  I walked out, and I said, I told him, I said, 'I'm on FMLA.  I need new paperwork for the new year FMLA,' and he said, 'No, no FMLA.'").[10]  And finally, plaintiff testified that Mr. McCracken and Mr. Cloud both told plaintiff when he returned from FMLA leave that they wanted him at work "all the time."  *Id.* at 23 (Pl.'s Dep. 83:16–24).  Plaintiff testified that Mr. McCracken said this "almost every time" plaintiff took FMLA leave, and Mr. Cloud said this "two or three times[.]"  *Id.* (Pl.'s Dep. 83:25–84:9).

Even accepting plaintiff's testimony that both Mr. McCracken and Mr. Cloud made these comments, they're still insufficient to show pretext.  That's because, as plaintiff concedes, Mr. McCracken and Mr. Cloud did not make the decision to terminate plaintiff's employment.  And contrary to plaintiff's argument, Mr. Cloud and Mr. McCracken were not so involved in the

---

[10]     The record also reflects that when plaintiff requested FMLA leave in early November 2018—shortly before he was fired—Mr. McCracken emailed Ms. Fortney asking if plaintiff was approved for this leave.  *See* Doc. 65-149 at 2.  Ms. Fortney responded that he was, and she suggested that Mr. McCracken proactively send plaintiff new FMLA paperwork by year's end since plaintiff's FMLA leave was "recurring[.]"  *Id.*  Mr. McCracken responded that he had scheduled a meeting with plaintiff "to find out if he needs new paperwork to continue it" and then, a follow-up meeting "to finalize wherever we land."  *Id.*

termination decision that their comments or behavior are relevant to the pretext analysis.

Resisting this conclusion, plaintiff invokes the "cat's paw" or "rubber stamp" theory of

subordinate bias liability. Under that theory, an employer is liable when "a biased subordinate,

who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate

scheme to trigger a discriminatory employment action." *BCI Coca-Cola*, 450 F.3d at 484; *see*

*also Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011) (elaborating on this theory).

But that theory can't fit this case's summary judgment facts. Despite plaintiff's rhetorical

efforts, he has no evidence to support his theory that Mr. McCracken and Mr. Cloud pulled the

strings when defendant decided to terminate plaintiff's employment. His argument that Mr.

McCracken and Mr. Cloud triggered the series of events leading to that decision won't cut it

either. A plaintiff invoking the subordinate bias theory "must establish more than mere

'influence' or 'input' in the decisionmaking process." *BCI Coca-Cola*, 450 F.3d at 487.

Here, the summary judgment record confirms that Mr. McCracken and Mr. Cloud merely

reported the breakroom incident and provided their side of the story to Ms. Klamm when she

investigated it. And, after also hearing plaintiff's side of the story, Ms. Klamm and Mr. Kellison

made the decision to terminate plaintiff's employment on their own—without any involvement

from Mr. McCracken or Mr. Cloud. That fact alone defeats any causal link between whatever

FMLA bias Mr. McCracken and Mr. Cloud may have had and defendant's decision to fire

plaintiff. *See id.* at 488 (explaining that an employer's "tak[ing] care not to rely exclusively on

the say-so of the biased subordinate," and "simply asking an employee for his version of events

may defeat the inference that an employment decision was . . . discriminatory" or retaliatory);

*see also Dewitt v. Sw. Bell Tel. Co.*, 41 F. Supp. 3d 1012, 1019 (D. Kan. 2014) (concluding that,

because no evidence suggested that the decisionmakers "heard, made or agreed" with any of the

subordinate's general anti-FMLA comments, such comments "fail[ed] to raise any inference of a pretextual termination decision"), *aff'd*, 845 F.3d 1299 (10th Cir. 2017).

*Last*, Mr. Kellison's comments—which are relevant because he was the ultimate decisionmaker—are too attenuated from the termination decision to show pretext.  Plaintiff spotlights three comments by Mr. Kellison:  (1) a 2009 email where Mr. Kellison wrote he was "not quite as optimistic" that transferring plaintiff to a truck driver position as a reasonable accommodation would "be less strenuous on whatever body part [plaintiff] keeps injuring[,]" Doc. 72-47 at 2; (2) Mr. Kellison's 2015 report that he felt threatened by plaintiff's comment that Mr. Kellison was "next" and that he would "put [Mr. Kellison] under oath" at a workers' compensation hearing, Doc. 72-43 at 11 (Kellison Dep. 117:18–118:3); Doc. 65-102 at 3 (Fortney HR Memorandum); and (3) Mr. Kellison's agreement with plaintiff's counsel at his deposition that plaintiff "could be delusional" and "paranoid[,]" Doc. 72-43 at 18 (Kellison Dep. 163:11–16).

None of these comments create a genuine pretext dispute, even accepting plaintiff's characterization of these comments as disparaging.  Our Circuit has held that a supervisor's disparaging comment directed at a plaintiff more than a year before the termination decision didn't suggest pretext because it was "too far attenuated from [plaintiff's] termination to be probative of [defendant's] motivation."  *Bittel v. Pfizer, Inc.*, 307 F. App'x 132, 141 (10th Cir. 2009) (citing *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (holding that racial remark made by one person involved in termination decision 10 months before termination was too remote to support a finding of pretext)).  Mr. Kellison's comments—ranging from nine years to three years before the termination decision—necessarily are too remote to suggest pretext.  And Mr. Kellison's deposition testimony says nothing about plaintiff's

workplace injuries, his resulting disabilities, his FMLA leave, or his workers' compensation claim. So, that testimony can't support pretext either.

In sum, no reasonable juror could conclude that plaintiff's highlighted comments reveal a pretext for discrimination or retaliation.

### 5. Failure to Discipline Plaintiff Progressively and Disparate Treatment

Plaintiff's last pretext argument relies on two other related theories. He first contends that defendant deviated from its disciplinary policy that defendant shouldn't fire an employee unless "other forms of discipline have not resolved the issue[,]" or there are "multiple or repeated incidents of misconduct." Doc. 72-34 at 5 (Def.'s Disciplinary Process Procedure). While plaintiff's argument is generally faithful to two components of defendant's disciplinary policy, plaintiff simultaneously ignores that defendant's policy also includes wide discretion. Indeed, the policy expressly contemplates that defendant "may terminate the employment relationship without using other levels of discipline through the disciplinary process." *Id.* at 2. And when defendant does so, the policy provides several steps defendant "shall" take before terminating the employment relationship. They include describing the basis for the termination decision, informing the employee of the intended action, and, importantly, providing the employee the opportunity to explain the reasons for his conduct and any reason defendant shouldn't impose the intended discipline. *Id.* at 5–6. Defendant did all those things. Mr. Kellison, Ms. Klamm, and Ms. Fortney all met with plaintiff to discuss the breakroom incident one last time before terminating his employment. And when, in defendant's view, plaintiff didn't take accountability for his actions and even asserted that Mr. Cloud told plaintiff "he [wa]s willing to lie to get [him] out of trouble[,]" defendant decided to proceed with termination. *See* Doc. 72-43 at 18 (Kellison Dep. 162:13–163:8).

To be sure, and as it acknowledges, defendant could've imposed other milder disciplinary measures.  *See* Doc. 72-43 at 7 (Kellison Dep. 37:11–16); Doc. 72-37 at 6 (Hentschel Dep. 51:18–52:13).  But "where progressive discipline is entirely discretionary, and the employer did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext."  *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013) (quotation cleaned up) (affirming summary judgment for employer because of insufficient pretext evidence); *see also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) ("[E]ven if [the employer] fell short of [plaintiff's] expectation of progressive discipline, this fact adds little to the pretext analysis" because the "'mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual.'" (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995))).

Next, and relatedly, plaintiff argues that defendant treated him differently than other employees who also hung out in the breakroom before work but weren't fired.  While true on its face, no reasonable juror could conclude that the other employees that plaintiff alludes to were similarly situated.  Plaintiff doesn't identify another employee who decided to clock in and sit in the breakroom for an hour without working, all while claiming to his supervisor that he had permission to do so.  That defendant fired plaintiff for this behavior—which it viewed as insubordination—without firing other employees who also hung out in the breakroom after clocking in, is "unsurprising" and thus, not evidence of pretext.  *See Litzsinger*, 25 F.4th at 1290 (rejecting plaintiff's disparate treatment pretext argument because although defendant hadn't fired any other employee "for intermittent personal use of the Internet," it fired plaintiff for that

reason because she "was on probation" for "excessively us[ing] the Internet for reasons unrelated to work").

Whether analyzed in isolation or in the aggregate, plaintiff's arguments don't establish a genuine dispute of material fact whether defendant's stated reason for terminating plaintiff's employment was a pretext for discrimination or retaliation.  This conclusion means that no reasonable juror could find that defendant's termination of plaintiff's employment violated the ADA, FMLA, or Kansas common law.

## IV.    Conclusion

In an employment dispute, the court does "not ask whether the employer's reasons [for terminating plaintiff's employment] were wise, fair or correct;" it asks, instead, "whether the employer honestly believed its reasons and acted in good faith upon them."  *Riggs*, 497 F.3d at 1118–19.  In short, the court isn't a "'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Young*, 468 F.3d at 1250.  Here, the summary judgment facts present no genuine issue whether defendant's reasons for terminating plaintiff's employment were a pretext for discrimination or retaliation.  And, without a triable issue of pretext, it's not the court's role to second guess defendant's workplace decision.

Thus, for all the reasons explained by this Order, the court grants defendant's Motion for Summary Judgment (Doc. 64).  The court directs the Clerk to enter Judgment in defendant's favor against plaintiff's claim and then close the case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 64) is granted.

**IT IS SO ORDERED.**

Dated this 29th day of March, 2022, at Kansas City, Kansas.

<u>s/ Daniel D. Crabtree</u>
Daniel D. Crabtree
United States District Judge